# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 12-cv-1629 (JFB)(WDW)
_____

## JONEL BARBU,

Plaintiff,

VERSUS

## LIFE INSURANCE COMPANY OF NORTH AMERICA, DBA CIGNA,

Defendant.

_____

### MEMORANDUM AND ORDER
August 7, 2014

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Jonel Barbu ("plaintiff") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), challenging the termination of his long-term disability benefits, which were paid for approximately 17 months until defendant Life Insurance Company of North America ("defendant" or "LINA") determined that plaintiff was no longer disabled. Although both parties moved for summary judgment, they have since stipulated that the Court should conduct a "bench trial on the papers" based on their summary judgment submissions. Having done so, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes that plaintiff has met his burden to show that he is disabled and entitled to benefits.

As is explained in more detail below, when LINA terminated plaintiff's disability

benefits, he continued to suffer from various musculoskeletal conditions and ulcerative colitis, and none of plaintiff's treating physicians had noted any improvement in his condition. The administrative record includes findings by six treating providers, recorded at various times, showing that plaintiff is unable to work at all, as well as other evidence which supports those findings. Nonetheless, defendant concluded that plaintiff's records did not prove a continuing disability because they did not contain updated test results measuring plaintiff's ability to perform specific functional tasks, even though defendant's previous determinations that plaintiff was disabled were based on records which included functional measurements, as well as the results of MRIs, x-rays, an EEG, and strength and range of motion tests.

Having considered the entire record, the Court concludes that plaintiff has met his burden to show that he was disabled under the Policy. The unified opinions of

plaintiff's treating providers are based on their first-hand impression of his condition and corroborated by the objective findings, which include a functional capacity evaluation ("FCE") showing that plaintiff cannot stand continuously for more than 9 minutes, or sit for more than 7 minutes, due to multiple degenerative changes in his spine, among other disorders. Separately, plaintiff's gastroenterologist concluded that plaintiff could not return to work solely because of his ulcerative colitis, which could become worse with the stress of work. These findings, among others, are essentially unrebutted by defendant, which based its decision on an absence of "time concurrent" evidence of plaintiff's functional limitations, rather than on any affirmative finding that plaintiff's condition improved. However, the Policy contains no requirement that records be "time concurrent," nor does it require that particular tests be performed. As a result, the Court affords less weight to the opinions of defendant's reviewers, which were based on these non-Policy standards. The Court credits the unified opinions of plaintiff's treating providers and ultimately concludes that plaintiff has met his burden to show that he is disabled under the Policy's "Regular Occupation" disability standard.

However, in its discretion, the Court concludes that, for any benefits beyond the 24-month "Regular Occupation" period, remand is appropriate. The disability standard changes after 24 months of benefits to an "any occupation" standard, and LINA did not have the opportunity to apply the "any occupation" standard to plaintiff's claim before this lawsuit began. The Court also grants summary judgment to defendant in part, based only on its counter-claim for Social Security benefits plaintiff received in 2010, and denies the remainder of defendant's motion.

## I. BACKGROUND

Defendant notified plaintiff that it had terminated his disability benefits on June 1, 2011. (LINA[1] 00643.) Plaintiff appealed that determination on August 8, 2011 (*id.* 00698), and defendant twice reaffirmed its decision, notifying plaintiff by letter on November 4, 2011 (*id.* 01051) and on April 4, 2012 (*id.* 01035).

Plaintiff filed the complaint on April 3, 2012. On May 30, 2013, plaintiff moved for a declaratory judgment concerning whether the *de novo* or arbitrary and capricious standard of review would apply to this case. Defendant responded to that motion on June 14, 2013, arguing that the arbitrary and capricious standard should apply, and plaintiff replied in further support of the *de novo* standard on June 23, 2013. The Court heard oral argument concerning the standard of review on December 17, 2013. On December 19, 2013, the Court ruled that the Policy did not grant discretion to defendant and that the *de novo* standard would apply to the Court's review of plaintiff's claim for benefits. *See Barbu v. Life Ins. Co. of N. Am.*, -- F. Supp. 2d. --, No. 12-cv-1629 (JFB)(WDW), 2013 WL 6690402, at *7 (E.D.N.Y. Dec. 19, 2013).

On January 31, 2014, defendant moved for summary judgment, which plaintiff opposed on February 17, 2014, while also cross-moving for summary judgment. Defendant opposed plaintiff's cross-motion and replied in further support of its motion on March 3, 2014, and plaintiff replied in further support of its motion on March 10, 2014.

---

[1] The parties' evidentiary submissions are partially overlapping, and for ease of reference the Court refers to most documents in the administrative record by their Bates-stamp numbers.

The Court heard oral argument on the summary judgment motions on April 21, 2014, during which the Court asked the parties to address the Second Circuit's decision in *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011). *O'Hara* was also an ERISA case where the defendant moved for summary judgment. The district court reviewed the denial of benefits under a *de novo* standard and granted defendant's motion, determining that defendant's decision to deny benefits was supported by the evidence. *Id.* at 115-16. The Second Circuit reversed because the district court effectively conducted a bench trial on the papers, instead of applying a summary judgment standard, even though the parties had not consented to that procedure. *Id.* at 117 ("The critical question for the district court was whether there was a genuine dispute of material fact, not whether the administrator's decision was supported by sufficient evidence on the merits."). In an earlier decision, the Second Circuit noted the important difference between the summary judgment and bench trial standards as applied to a district court's review of ERISA claims, *see Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003), and in *O'Hara*, the Court made clear that the parties must expressly consent to a "bench trial on the papers" if they intend for the district court to resolve factual disputes. *O'Hara*, 642 F.3d at 116.

Here, as in *O'Hara*, the summary judgment motions revealed genuine factual disputes, so the Court ordered the parties to clarify whether they sought summary judgment or a bench trial on the papers. On April 23, 2014, the parties submitted a stipulation stating that "[t]heir previously submitted Motions for Summary Judgment are to be considered under Rule 52 of the Federal Rules of Civil Procedure as a 'summary trial' or 'bench trial on the papers' and not as Summary Judgment motions under Rule 56," and that "the evidence already submitted with said motions constitutes the entire Administrative Record for the Court's consideration."

## II. STANDARD OF REVIEW

A beneficiary of an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA itself does not define the standard of review applicable to such actions, *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996), but the Supreme Court has held that *de novo* is the presumptive standard, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As noted, this Court has previously determined that *de novo* review applies here.

The Court's *de novo* review "applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999). In other words, this Court acts as the finder of fact. *Muller*, 341 F.3d at 124 (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) ("A majority of us conclude that, in its discretion, the district court may try the case on the record that the administrator had before it")); *see also Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004) ("[U]pon *de novo* review, a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence").

## III. FINDINGS OF FACT

The following section constitutes the Court's findings of fact, pursuant to Federal Rule of Civil Procedure 52(a)(1). The findings of fact are drawn from the exhibits attached to the parties' summary judgment motions, which they have agreed constitute the entire administrative record. To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

### A. Definition of Disability

Plaintiff has been employed by Underwriter Laboratories since 1982 as an Engineering Associate. (Pl. 56.1 ¶ 12; Def. 56.1 ¶ 12.) Underwriter holds a Group Policy ("the Policy") with defendant for the benefit of its employees, including plaintiff. The Policy defines "Disability/Disabled" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is . . . unable to perform the material duties of his or her Regular Occupation.[2]

(LINA 01225.) Plaintiff's "material duties" are further defined by the Labor Department's Dictionary of Occupational Titles ("DOT"). The parties agree that those duties included performing "light" work, which requires, among other things, the ability to lift, carry, push, or pull 20 pounds occasionally (10 pounds frequently), and the ability to walk or stand frequently. (Id. 00315.) The DOT defines "frequently" as up to two-thirds of the time, such as 5.67 hours in an 8-hour day. (Ex. D to Pl. 56.1 at 24.) Thus, as is discussed below, plaintiff's burden is to establish that he lacked these abilities, and was therefore disabled and eligible for benefits under the terms of the Policy.

### B. History of Plaintiff's Claim

### 1. Prior Disability Determinations

Although plaintiff's claim was ultimately denied in June 2011, LINA previously determined several times that plaintiff was entitled to disability benefits. The first approval had an "Incurred Date" of January 23, 2010, based on the determination of Dr. Ginzburg (discussed below) that plaintiff suffered from ulcerative colitis. (LINA 00943-44.) Plaintiff was initially granted four weeks of short-term benefits, and subsequently, LINA reconsidered his claim and re-approved it at least seven more times, based on the ulcerative colitis as well as plaintiff's various musculoskeletal problems. (Id. 00131-32, 00192, 00217, 00240, 00605-06, 00901-02, 00910-11.) The records of some of these approvals note that plaintiff's disability was supported by clinical testing, including an EMG, MRIs, and range of

---

[2] This definition applies to a claimant's first 24 months of long-term disability benefits, which is relevant here because plaintiff collected long-term benefits for less than 24 months before they were terminated and before he filed the complaint in this action. The 0-24 month definition also includes a second requirement, that plaintiff be "unable to earn 80% or more of his . . . Indexed Earnings from working in his . . . Regular Occupation." (LINA 01225.) The parties do not dispute that this second requirement is redundant in this case because of the nature of plaintiff's disabilities. As is discussed herein, plaintiff has proven by a preponderance of the evidence that he cannot work at all in his "Regular Occupation," and therefore the Court necessarily concludes that he cannot earn 80% of his normal wages. The Court addresses the definition of

---

disability after 24 months of payments in section VI, *infra*.

4

motion testing. (*See, e.g.*, *id.* 00217, 00901-02.)

The first record of an adverse determination with respect to plaintiff's claim is from May 27, 2011, when a nurse determined that plaintiff's medical record only supported the existence of a disability through December 9, 2010. (*Id.* 00781.) The nurse did not note any change in plaintiff's diagnoses; instead, she opined that there was an absence of evidence in the records. In particular, the nurse stated that plaintiff's file lacked current physical therapy notes, range of motion tests, strength tests, and lab data, which could provide proof of plaintiff's "functional loss." (*Id.*) The review did not conclude that plaintiff's condition had improved, nor that he was capable of performing the light work required of an Engineering Associate.

On June 1, 2011, LINA informed plaintiff by letter that his benefits were terminated. (*Id.* 00643.) That letter highlighted certain findings from plaintiff's recent medical history, including his ability to form bowel movements and his clearance to travel to Romania.[3] However, it did not address the fact that there had been no change in plaintiff's diagnoses of ulcerative colitis and various musculoskeletal problems, or that no treating provider had observed a positive change in his condition.

The letter also misstated the conclusion of Dr. Ginzburg with respect to whether plaintiff could return to work: on April 14, 2011, Dr. Ginzburg wrote that a specific restriction on plaintiff (due to ulcerative colitis) was that he required frequent access to a bathroom, and that he *could not* return to work even if an accommodation were made for that restriction. (*Id.* at 00054.) The June 1 letter incorrectly cited Dr. Ginzburg to suggest that plaintiff *could* return to work as long as he had frequent access to a bathroom.

Like the May 27 review, the June 1 letter did not draw its own conclusion about plaintiff's functionality as compared to the requirements for an Engineering Associate, but instead determined that plaintiff's file contained insufficient evidence of his functional limitations, noting a need for current physical therapy notes and range of motion and strength testing. (*Id.* 00644.)

2. Required Information for Disability Determinations

The basis for LINA's denial of plaintiff's disability benefits—the lack of certain tests performed within a certain time period—is not itself a requirement of the Policy. The same provision of the Policy that defines disability simply states that "[t]he Insurance Company will require proof of earnings and continued Disability" (LINA 01225), but does not specify that the continued disability must be documented or proven with any particular form of evidence or test, or performed within any particular time period. In fact, a LINA appeals supervisor testified that there is no LINA requirement for which tests must be included in a claimant's medical records, or how recently they must have been performed. (Ex. F to Pl. 56.1 at 19-20, 148.) The Policy requires only that a claimant

---

[3] As is discussed in more detail *infra*, to the extent that these observations were meant to suggest an improvement in plaintiff's overall medical condition, the Court finds that "[t]he record clearly indicates that LINA cherry-picked selective item[s] of submitted evidence in order to support its decision that the Plaintiff was not disabled under the Plan," *Jones v. Life Ins. Co. of N. Am.*, 829 F. Supp. 2d 165, 173 (W.D.N.Y. 2010), because these isolated observations are drawn from the records of providers who concluded that plaintiff was unable to return to work.

remain under the "appropriate care" of a physician, which is defined as:

> The determination of an accurate and medically supported diagnosis . . . or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care.

(LINA 01233, 01243.)

Outside of the Policy, LINA's communications to both plaintiff and his treating providers contained guidance concerning the information necessary to support plaintiff's claim, but the information was described in general terms, and did not specify that any particular test within a particular time period was required. For example, when LINA first informed plaintiff that his application for Short-Term Disability benefits was approved, the letter instructed him that LINA would "continue to monitor" his claim, and would "periodically . . . request updated information to confirm [his] restrictions and limitations." (*Id.* 00507.) The most specific instruction in the letter was that, if he could not return to work within four weeks, plaintiff should submit a "Medical Request Form" ("MRF") and copies of "supporting reports, such as office notes/consultations/testing." (*Id.*) Thus, "testing" was a suggested example of records to be submitted, but LINA neither defined the type of testing to which it referred nor required that any testing be performed with a certain time period relative to the claim.

LINA's other communications to plaintiff are even more general. The letter informing him that he would receive Long-Term benefits (after the initial short-term period) used the same periodic-monitoring language quoted above, with no reference to any particular type of test required to support plaintiff's claim. (*Id.* 00610-11.) Subsequent letters in October and November 2010, while plaintiff continued to receive disability benefits, simply referred to LINA's need for "medical records" from Drs. Jakobsen and Ginzburg. (*Id.* 01080-82.)

LINA also communicated with plaintiff's treating providers concerning the information it needed to assess and monitor plaintiff's claim. In each letter, LINA provided the following list of necessary information:

> -Complete copies of physical therapy notes . . .
> -Hospital Intake/Discharge Summary . . .
> -Test results/findings (for example MRI's, EKG's, x-ray's, etc)
> -Treatment plan . . .
> -Restrictions and limitations that prevented plaintiff from returning to work.
> -Estimated return to work date/date patient was released to return to work.

(*See, e.g.*, *id.* 00206, -07, 00311, 00638, 01085.)

Although the letters sometimes referred to dates of treatment, they did not specify that any particular test or examination must have been performed within a certain time period relative to LINA's benefits determination. Instead, like the letters to plaintiff, the letters to his providers cited general examples of relevant testing, and the same boilerplate language appeared in every letter issued before the next benefits

determination. For example, the letter to Dr. Jakobsen in October 2010 used the above-quoted language without addressing whether the MRIs, x-rays, EKG, and strength and range of motion testing he ordered between April and June 2010 were still considered valid by LINA in October 2010. Nothing in the letter indicated that those tests were not valid, and in fact, LINA concluded that those records supported plaintiff's disability through December 9, 2010. (*Id.* 00781.) In other words, throughout 2010, the Court finds that neither plaintiff nor his providers were warned that the April-June 2010 tests were at risk of being out of date. Plaintiff continued to receive benefits and his physicians continued to respond to LINA's requests by providing notes of their examinations of plaintiff, which indicated no improvement in his condition.

In April 2011, LINA sent the last letters to Drs. Jakobsen and Ginzburg before the denial of plaintiff's benefits on June 1, 2011, and continued to use the same boilerplate language. Neither letter noted a concern that any of the clinical evidence in plaintiff's file was out of date, that any particular type of test was missing, or that the doctors' previous submissions were insufficient to support the continued payment of disability benefits. (*Id.* 00052, 00638.) Nevertheless, the June 1, 2011 letter informing plaintiff of the denial of his benefits stated that his file contained insufficient evidence of his functional limitations, such as current physical therapy notes and range of motion and strength testing. (*Id.* 00644.)

### C. The Social Security Determination

Nine days after December 9, 2010, the latest date on which defendant considered plaintiff's medical records to support his disability, the Social Security Administration ("SSA") informed plaintiff that his claim for disability benefits had been approved. (Ex. P to Horbatiuk Decl.) Thus, from December 2010 onward, plaintiff was considered disabled for the purposes of Social Security, but not for LINA's disability benefits (although he continued to receive LINA's benefits until June 1, 2011). As a result of the SSA determination, plaintiff received $8,831.25 in retroactive benefits for the period covering July to November 2010, during which he also received benefits from defendant. As provided for in the Policy, defendant has counter-claimed for this amount, and plaintiff does not dispute that defendant is entitled to recoup the retroactive benefits. (*See* Pl. 56.1 ¶ 88.) However, plaintiff contends that he "does not owe any overpayment because the amount of the alleged overpayment is exceeded by the amount of the LTD benefits that CIGNA has failed to pay." (*Id.* ¶ 92.) Accordingly, the Court grants summary judgment to defendant in part, on its counter-claim only, in the amount of $8,831.25.

### D. Plaintiff's Medical Records

The medical records that supported plaintiff's claim for disability benefits until June 1, 2011 date back to January 2010. Because plaintiff continued to submit additional medical evidence during his appeal, they cover a period running to November 2011. During that time, plaintiff was examined and treated in person by six different providers (four doctors and two therapists), five of whom explicitly concluded that he was not capable of returning to work, both because of his musculoskeletal problems, and also because of his ulcerative colitis (a separate condition). The remaining provider did not express an opinion about plaintiff's return to work, but his measurements show that plaintiff was unable to return to work, and

are consistent with the findings of the other providers. No treating provider whose records were submitted to this Court concluded that plaintiff was capable of returning to work.

### 1. Dr. Jakobsen

Plaintiff saw Dr. Kwan Jakobsen—a physiatrist—more than ten times. Over the course of these visits, Dr. Jakobsen's initial conclusion remained unchanged: that plaintiff was "totally disabled and unable to work in any field." (LINA 00372; *cf. id.* 00464.) She initially based this conclusion on plaintiff's subjective complaints of chronic pain in the back, shoulder, and knee, but Dr. Jakobsen's notes reflect that she ordered various clinical tests after the first appointment. (*Id.* 00373.) Between April and June 2010, plaintiff underwent computer testing for muscle strength and range of motion, which ultimately showed deficits in both areas, as well as MRIs and x-rays, which revealed multiple degenerative changes in plaintiff's spine. (*Id.* 00092-94.) In May and June 2010, Dr. Jakobsen attributed plaintiff's chronic pain and functional limitations to the degenerative changes shown in these tests. (*Id.*) Although Dr. Jakobsen's records do not suggest that she ever ordered additional computerized tests, MRIs, or x-rays after June 2010, her later notes show that she examined plaintiff regularly, saw no change in his symptoms, and continued to conclude that plaintiff was unable to return to work. (*See, e.g.*, *id.* 00057-58 (notes dtd. 11/29/10); 00043-44 (notes dtd. 4/18/11).)

### 2. Dr. Ginzburg

Plaintiff also began seeing Dr. Lev Ginzburg in 2010. Dr. Ginzburg is a gastroenterologist who, in January 2010, diagnosed plaintiff with ulcerative colitis (*id.* 00434-35), a condition that was noted by Dr. Jakobsen but not addressed by him, as it is independent of plaintiff's various musculoskeletal conditions. Dr. Ginzburg's diagnosis was confirmed by a colonoscopy on January 25, 2010 (*id.* 00430-31), after which Dr. Ginzburg reported to LINA that plaintiff's ulcerative colitis prevented his return to work. (*Id.* 00437.) In particular, Dr. Ginzburg noted that the ulcerative colitis caused plaintiff to suffer from frequent abdominal pain, bloody stool, fatigue, and unpredictable bowel movements, the last of which was the primary restriction on his ability to work. (*Id.*) Although Dr. Ginzburg initially predicted that plaintiff could return to work in two or three months (*id.*), he later suggested that plaintiff's return was contingent upon showing signs of progress. (*Id.* 00164 (MRF dtd. 7/15/10).) As late as April 14, 2011, Dr. Ginzburg still reported that it was "to be determined" when plaintiff could return to work, based solely on the restrictions caused by ulcerative colitis. (*Id.* 00054 (MRF dtd. 4/14/11).) After plaintiff's benefits were denied in June 2011, Dr. Ginzburg submitted a letter in July 2011 noting no change in his assessment, and warning that plaintiff's ulcerative colitis could become worse if he was subjected to the stress of work. (*Id.* 00708.)

### 3. Dr. Myones

In June 2010, Dr. Andrew Myones—a chiropractor and nutritionist—completed a "Medical Source Statement" for plaintiff's Social Security case, which stated that he first treated plaintiff in December 2009, and saw him most recently on June 19, 2010. Dr. Myones concluded that plaintiff was "totally disabled." (*Id.* 00476.) In particular, he found that plaintiff's pain levels were moderately severe, would increase in a competitive work environment, and would interfere with plaintiff's attention and concentration. (*Id.* 00474-75.) Dr. Myones also addressed the specific

functional requirements of light work required by plaintiff's job, and found that plaintiff was limited to sitting for less than one hour a day, walking for one hour a day, and lifting less than five pounds. (*Id.* 00475.) Plaintiff could "never" carry items of any weight, or perform many basic actions such as balancing, stooping, kneeling, or reaching and handling with his right hand. (*Id.* 00475-76.) Thus, the Court finds that Dr. Myones's records provide direct evidence that plaintiff was unable in June 2010 to perform "light" tasks required of an Engineering Associate. On October 7, 2011, after plaintiff's benefits were denied, Dr. Myones submitted a brief letter to LINA stating that plaintiff's condition had deteriorated since the June 2010 Medical Source Statement, and that he remained unable to work in any environment. (*Id.* 00477.)

### 4. Rajul Rathod

On April 15, 2010, plaintiff's physical therapist, Rajul Rathod, examined plaintiff and submitted a Medical Source Statement similar to the one submitted by Dr. Myones. (*See id.* 00122-24.) For example, Rathod shared Dr. Myones's conclusion that plaintiff was limited to sitting less than one hour, and standing and walking no more than one hour, in an eight-hour work day. (*Id.* 00123.) Unlike Dr. Myones, Rathod found that plaintiff could "occasionally" lift and carry items up to 10 pounds, but even that finding was short of the light-work requirement that plaintiff be able to carry such items "frequently." (*Compare id.* 00124, *with id.* 00315.) Rathod also found that plaintiff's pain was moderately severe "with activity," and that he would need a 15-minute break every 30-45 minutes at work because of how often he experienced fatigue. (*Id.* 00124.)

Rathod's findings are limited to plaintiff's functional capabilities, and do not include an opinion whether plaintiff could return to work in any capacity. Thus, although Rathod did not express the view that plaintiff was "totally disabled," as did the other providers, the Court finds that his Medical Source Statement is consistent with the opinions of the other providers, in particular because Rathod observed that plaintiff could not sit, stand, or walk for more than one hour in an eight hour workday; plaintiff would require a 15 minute rest every 30-45 minutes due to his chronic fatigue; and the return to a competitive work environment would make plaintiff's symptoms worse. (*Id.* 00122-24.)

### 5. Timothy Golub

Timothy Golub examined plaintiff on November 16, 2011, during plaintiff's appeal of the benefits denial, and performed a "functional capacity evaluation" ("FCE"), which is the type of clinical test repeatedly cited by LINA reviewers as necessary but absent from plaintiff's records. Accordingly, the November 2011 FCE was intended to supplement plaintiff's appeal of the denial of benefits.[4]

Golub concluded that plaintiff could not even meet the "sedentary strength" capability, which is less demanding than light work. (*Id.* 00472.) In particular, Golub measured that plaintiff could stand for just 9 minutes, which did not meet the DOT requirement of standing for 30

---

[4] Although Golub's FCE was thus not available to LINA when it first denied plaintiff's benefits on June 1, 2011, LINA's letter on that same date instructed plaintiff to submit additional information in his appeal, to include test results, covering the period beyond June 1, 2011. (LINA 00645.) Thus, LINA encouraged plaintiff to submit later-acquired evidence of his entitlement to benefits.

minutes; Golub also concluded that plaintiff could not meet the requirement of standing for 2 hours total in a workday. (*Id.*) Likewise, plaintiff sat for only 7 minutes, less than the DOT-required 30 minutes, and he could not sit for 6 total hours in a workday. (*Id.*) Plaintiff was also deficient in lifting, carrying, pushing, and pulling, among other areas. (*Id.*)

Although, as is discussed below, one of defendant's reviewers faulted Golub's FCE for lacking unspecified validity testing, there is no evidence that LINA ever demanded validity testing or attempted to subject plaintiff to an FCE with validity testing. LINA has submitted no data or other evidence to contradict the measurements in Golub's FCE, which was reviewed and accepted by three of plaintiff's other experts. Thus, the Court finds that, as of November 2011, plaintiff was incapable of standing for more than 9 minutes continuously and 2 hours total in a workday, and incapable of sitting for more than 7 minutes continuously and 6 hours total in a workday. In other words, plaintiff did not meet the DOT's sedentary or light work categories.

### 6. Dr. Carfi

The last doctor to physically examine plaintiff was Dr. Joseph Carfi, a physiatrist who saw plaintiff on November 23, 2011, during plaintiff's appeal, at the request of plaintiff's counsel. (*Id.* 00478.) Dr. Carfi concluded that plaintiff was "functionally unemployable in the competitive job market" because of both his musculoskeletal degeneration as well as his ulcerative colitis, and the depression and anxiety that accompanied those conditions. (*Id.* 00481.) Dr. Carfi's conclusion was based on a physical examination of plaintiff, which included (among other tests) measurements of his reflexes and range of motion. Dr. Carfi also reviewed plaintiff's medical records from 2010 and 2011, including the Golub FCE, and noted that the records reflected no improvement in plaintiff's condition over time. (*Id.* 00478-81.)

### E. Defendant's Reviewers

Plaintiff appealed the denial of his benefits on August 8, 2011 (*Id.* 00698-99), and defendant sent his file to two medical reviewers: Dr. Clarence Fossier, an independent medical examiner who does not work directly for LINA, and Dr. John Mendez, who does.[5]

### 1. Dr. Fossier

Dr. Fossier is an orthopedic surgeon, unlike plaintiff's treating providers. His report on plaintiff's file is 7 pages long. The first 5 ½ pages simply recite plaintiff's medical history, and on the final page and a half, Dr. Fossier offered his answers to five specific questions posed to him by LINA, concluding that plaintiff was not totally disabled. (*Id.* 00679.) His exact words are as follows:

> Rationale: From an Orthopaedic perspective, I do not believe the claimant is totally disabled. He has multiple areas showing

---

[5] Plaintiff's file was also reviewed by various nurses and LINA employees before the June 2011 termination, and by a vocational rehabilitation counselor afterward, but the Court finds that the ultimate denial of his claim after two appeals was based on the reviews by Drs. Fossier and Mendez. The November 4, 2011 and April 4, 2012 letters informing plaintiff that his appeal was denied cite directly to the reviews by Drs. Fossier and Mendez, and do not emphasize the conclusions of any other reviewer. (LINA 01035-37; 01051-53.) The deposition testimony of the appeals specialists who handled plaintiff's file after Dr. Mendez's review further confirms that the appeal decision rested most of all on Dr. Mendez's medical judgment. (*See* Ex. F to Pl. 56.1 at 84-85; Ex. G to Pl. 56.1 at 47-48.)

degenerative changes and also has carpal tunnel syndrome. I do not see a FCE which if valid would provide reasonable restrictions and limitations. I would think he could at least work at a light activity level.

(*Id.*)

Dr. Fossier did not explain why he "would think" that plaintiff could perform light work; in other words, he did not discuss what data, diagnosis, or other evidence from the medical records supported his conclusion, even as he implicitly faulted plaintiff's treating providers for reaching the opposite conclusion without a current FCE.

### 2. Dr. Mendez

After Dr. Fossier, the next reviewer was Dr. Mendez, who is board-certified in occupational medicine and employed by defendant for the purpose of reviewing benefits claims. (Ex. F to Horbatiuk Decl. at 12.) Unlike Dr. Fossier, Dr. Mendez explicitly had no opinion concerning plaintiff's functional abilities; instead, his conclusion in March 2012 was simply that plaintiff's disability was unsupported by the evidence because his medical record did not include time-concurrent measurements of functional limitations. (*Id.* at 190; LINA 00450-51.) Dr. Mendez's definition of "time-concurrent" is one month; in other words, in order to remain eligible for benefits on June 1, 2011, plaintiff was required to have certain tests performed in May or June 2011 and documented in his medical record. (Ex. F to Horbatiuk Decl. at 79, 80.) In Dr. Mendez's view, these tests would include an FCE and computerized range of motion measurements, but would not include MRIs, x-rays, or EEGs, which he deemed "diagnostic" as opposed to functional. (LINA 00450 ("Multiple diagnoses in the absence of accompanying measured limitations do not by themselves support a claim of impairment.").)

Thus, Dr. Mendez reduced plaintiff's entitlement to benefits to the question whether certain tests performed within a certain time period showed certain measured limitations. As noted above, that standard is not stated in the Policy, and defendant has identified no document incorporating such a requirement. Instead, Dr. Mendez testified that his standard is a product of his "clinical experience, expertise, and knowledge."[6] (Ex. F to Horbatiuk Decl. at 43-44, 73.) He suggested that his standard was no surprise to plaintiff's treating providers (*id.* at 48), but as set forth above, the letters from LINA to plaintiff's treating providers did not state that particular tests were required within particular time periods. Instead, the letters used boilerplate language listing general examples of records that the treating providers should include with their MRFs, and there was no indication that the previously-provided records were insufficient or out-of-date.

### F. Plaintiff's Reviewers

As part of his appeal, plaintiff submitted his file to two additional reviewers: an orthopedist and a vocational specialist. The orthopedist, Dr. Mark Bromson, wrote a letter to plaintiff's counsel on February 15, 2012, answering the same five questions posed by LINA to Dr. Fossier, and

---

[6] Gary Person, who supervises claims appeals specialists for LINA (Ex. F to Pl. 56.1 at 19-20), confirmed that whether a medical record is considered time-concurrent is up to the reviewing medical expert, and is not addressed by any LINA manual. (*Id*. at 148.)

concluding that the medical records demonstrated a unified opinion among plaintiff's treating providers that he could not return to work. (LINA 00482-85.) Dr. Bromson noted that these conclusions were supported by the objective testing, which included the recent FCE performed by Golub, and the various tests ordered by Dr. Jakobsen. (*Id.* 00484.) In contrast, no objective tests supported Dr. Fossier's conclusion. (*Id.*)

Plaintiff's counsel also submitted his file to Amy Leopold, a vocational expert. Leopold largely reiterated the findings of the treating providers and Dr. Bromson, but did so with specific reference to plaintiff's duties as an Engineering Associate, and concluded that he would not be able to perform those duties because of his musculoskeletal problems and his ulcerative colitis. (*Id.* 00492.) Like Golub, who performed the November 2011 FCE, Leopold considered both the light work standard and the lesser sedentary standard, and concluded that "[t]he medical correspondence . . . from Mr. Barbu's treating physicians clearly documents and confirms that he is incapable of light, or even sedentary work, primarily due to his permanent condition of chronic lower back pain, degenerative disc disease, and ulcerative colitis." (*Id.* 00491.)

## IV. BURDEN OF PROOF

Although *de novo* review is not deferential toward the insurer, the burden to prove disability remains on plaintiff. *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). "Ultimately, the question of whether or not a claimant is disabled must be judged according to the terms of the Policy." *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010); *see also Kunstenaar v.*

*Conn. Gen. Life Ins. Co.*, 902 F.2d 181, 184 (2d Cir. 1990) ("The term 'disability' has a variety of meanings, depending on the context in which it is used. . . . The applicable definition is spelled out in the Plan.").

Thus, the definition of disability in the insurance policy is the relevant definition for the purpose of assessing whether plaintiff has met his burden. More specifically, the Policy requires plaintiff to prove that he cannot perform "light" work, which entails, among other things, the ability to lift, carry, push, or pull 20 pounds occasionally (10 pounds frequently), and the ability to walk or stand frequently, up to two-thirds of the time.[7] (*Id.* 00315; Ex. D to Pl. 56.1 at 24.)

## V. CONCLUSIONS OF LAW

The evidence in this record amounts to a conflict between plaintiff's six treating providers and LINA's two file reviewers. Although the Court is not required to afford any special deference to the treating providers, it may give their opinions appropriate weight "if it finds these opinions reliable and probative." *Paese*, 449 F.3d at 442. In particular, district courts may consider "the length and nature of [the treating provider and plaintiff's] relationship, the level of the doctor's

---

[7] As is discussed in more detail in section VI, *infra*, the Policy's definition of disability changes after 24 months. At that point, it requires that plaintiff be incapable of performing "any occupation for which he . . . is, or may reasonably become, qualified." (LINA 01225.) This standard was never applied to plaintiff's claim, because LINA denied it under the "Regular Occupation" standard before the 24-month period expired, and plaintiff filed suit challenging that decision before the "Regular Occupation" period expired. Therefore, the Court remands plaintiff's claim for benefits beyond 24 months for consideration under the "any occupation" standard.

expertise, and the compatibility of the opinion with the other evidence." *Connors v. Conn. Gen. Life. Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (noting the importance of considering duration of provider-patient relationship and the comparative expertise between treating and non-treating providers).

Thus, the Court may evaluate the opinions of the treating providers according to multiple factors. Although one factor could be whether the particular functional measurements cited by defendants' reviewers support plaintiff's disability claim, the Court need not follow defendants' reviewers in making those measurements (and how current they are) the primary basis of its decision. To the contrary, the Court may consider a range of evidence, to include objective testing and subjective reports of symptoms. *See Connors*, 272 F.3d at 136 ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.") (internal quotation marks and citations omitted). As the Supreme Court has instructed, "when judges review the lawfulness of benefit denials, they will often take account of several different considerations. . . . determin[ing] lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Metro. Life. Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

A. Length and Nature of the Relationship

The Court credits the opinions of Drs. Ginzburg and Jakobsen—whose records repeatedly state that plaintiff was totally disabled and should not return to work—in

particular because each doctor treated plaintiff on multiple occasions for more than one year. In addition, the nature of the relationships could be described as a typical doctor-patient relationship, because they did not begin in the context of litigation but instead evolved based on several in-person examinations which allowed the doctors to observe plaintiff over time. Furthermore, these doctors' deepened their knowledge of plaintiff's conditions by ordering objective tests, which confirmed and specified their initial diagnoses, and to which each doctor continued to refer as they monitored plaintiff's condition and documented his lack of improvement. For all of these reasons, the Court concludes that these doctors' opinions rest on the firmest factual bases and credits them above those of any other provider or reviewer.

B. Level of Expertise

The Court does not perceive a dramatic difference between the expertise of plaintiff's providers and those employed by defendant, with one exception: there is no evidence that defendant engaged a gastroenterologist to review the records of plaintiff's ulcerative colitis. Dr. Fossier, an orthopedist, considered only the musculoskeletal issues, and although Dr. Mendez made reference to plaintiff's ulcerative colitis, his analysis focused on measurements of functional impairment that are unrelated to the problems caused by ulcerative colitis. (*See id.* 00485 (report of Dr. Bromson noting that "[e]ven if Dr. Fossier were correct from an orthopedic standpoint . . . the patient would still have to be considered completely and totally disabled based upon the restrictions and limitations placed by Dr. Ginzburg")). Thus, the Court concludes that Dr. Ginzburg's conclusion that plaintiff should not return to work because of the ulcerative colitis—reaffirmed as late as July 2011—is

essentially unrebutted in the record, and is in fact supported by other evidence. (*See id.* 00484 (report of Dr. Bromson noting that although he is an orthopedist, he sees "nothing in the medical records to contradict Dr. Ginzburg's conclusion that the patient is completely and totally disabled due to his ulcerative colitis"), 00492 (Leopold concluding that ulcerative colitis "would make it impossible for [plaintiff] to manage his full-time position as a Quality Control Engineer if he needed to take frequent unscheduled bathroom breaks throughout the day . . . . while being expected to manage the care of others").)

## C. Compatibility of the Opinions with the Other Evidence

The Court concludes that the records of the six treating providers are highly probative, not only because they are based on in-person observations and treatment, but because they all corroborate each other. Each provider observed how the same conditions affected plaintiff, and no provider concluded that he was capable of returning to work.

In addition, the unified opinion of these providers is supported by the objective clinical evidence in the record. In particular, Dr. Jakobsen's initial diagnoses were all supported by the tests she ordered. She performed her own computerized spinal range of motion exam on June 11, 2010, and confirmed plaintiff's functional deficits. (*Id.* 00260-65.) On April 15, 2010, she was notified that the first x-rays showed degenerative changes in the spine (*id.* 00383), and on April 16, 2010, the first MRI showed degenerating and bulging discs (*id.* 00385). On May 14, 2010, she was notified that a second MRI revealed exaggerated lordosis and herniated discs. (*Id.* 00345-46.) Results of electrophysiological tests

performed on June 3, 2010, showed chronic radiculopathy and nerve entrapments. (*Id.* 00249-52.) Other courts in this district have concluded that similar tests showing disc generation and radiculopathy constituted "extensive" and "substantial" evidence of a claimant's disability, and this Court reaches the same conclusion. *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661(GEL), 2009 WL 222351, at *16 (S.D.N.Y. Jan. 30, 2009); *Alexander v. Winthrop, Stimson, Putnam & Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 435 (E.D.N.Y. 2007).

Although defendant's reviewers ultimately concluded that the range of motion exam, x-rays, MRIs, and other tests were out of date, the Court is not persuaded by that argument. First, none of plaintiff's treating providers observed any positive change in his condition after the performance of these tests. Even Dr. Mendez does not dispute that point. (Ex. F to Horbatiuk Decl. at 143.) The Second Circuit has noted that "a reversal in policy preceded by no significant change in [plaintiff's] physical condition" weighs against the insurer and in plaintiff's favor. *Connors*, 272 F.3d at 136; *see also Alfano*, 2009 WL 222351, at *23 (granting summary judgment to plaintiff who initially received benefits only to have determination reversed, where there was no evidence in record that his back condition improved); *Rappa v. Conn. Gen. Life Ins. Co.*, No. 06-CV-2285 (CBA), 2007 WL 4373949, at *10 (E.D.N.Y. Dec. 11, 2007) (reversing denial of benefits as arbitrary and capricious where "there [was] not one piece of evidence in the record which indicates that Rappa can sit for more than 30 minutes at a time, the capacity at which CGLIC provided him benefits up until late 2001"); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying

benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."). In other words, the Court is persuaded that plaintiff continues to meet the Policy's definition of disabled in part because LINA itself reached that conclusion on several occasions, and reversed course based on the purported absence of current evidence, rather than on the affirmative evidence in the medical records, all of which supports LINA's original determination that plaintiff is disabled.

Finally, the Court concludes that the treating providers' opinions are compatible with the weight of the evidence because they were confirmed by the objective data produced by the FCE in November 2011. That test measured plaintiff's ability to perform the specific tasks for sedentary work, which was even less strenuous than the light work required for plaintiff's job. (*Id.* 00472.) The results were that plaintiff was unable to stand for more than 9 minutes, sit for more than 7 minutes, walk for more than .01 miles, and lift more than 5 pounds, among other deficiencies. (*Id.* 00470-73.) The FCE thus demonstrates that plaintiff cannot perform the duties required by his Regular Occupation, and together with all of the evidence, it establishes an objective basis for concluding that plaintiff remained disabled under the terms of the Policy from his earliest tests in 2010, through November 2011.

D. Defendant's Reviewers

Considering first the June 1, 2011 letter, the Court concludes that "[t]he record clearly indicates that LINA cherry-picked selective item[s] of submitted evidence in order to support its decision that the Plaintiff was not disabled under the Plan." *Jones v. Life Ins. Co. of N. Am.*, 829 F. Supp. 2d 165, 173 (W.D.N.Y. 2010). A clearance to travel issued by one physician, combined with a limited data about plaintiff's bowel movements and the stability of his weight and electrolytes—data which emerges from the records of providers who concluded plaintiff was incapable of working—do not outweigh the data in the FCE and the findings of every treating provider that plaintiff was totally disabled. The fact that the June 1 letter misstated Dr. Ginzburg's findings about plaintiff's return to work simply underscores this point.

Turning next to the opinions of defendant's reviewers during the appeals process, Drs. Mendez and Fossier, the Court concludes that they are also incompatible with the weight of the evidence and far less probative than the opinions of the treating providers.

1. Dr. Mendez

The deposition testimony of the appeals specialists who handled plaintiff's file after Dr. Mendez's review confirms what is apparent from LINA's final denial letter: that the appeal decision rested most of all on Dr. Mendez's medical judgment. (*See* LINA 01035-37; Ex. F to Pl. 56.1 at 84-85; Ex. G to Pl. 56.1 at 47-48.)

The Court is not persuaded by Dr. Mendez's review because he effectively imposed a requirement beyond the terms of the Policy, an action which the Second Circuit has held "may well be found to be arbitrary and capricious." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); *see also Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 647 (2d Cir. 2002)

(reversing denial of benefits as arbitrary and capricious where "contrary to basic ERISA principles, Dr. Wolinsky in effect added additional language to the policy"). There was simply no requirement in the Policy or any other document that particular objective tests be performed or updated with any particular frequency. Given the lack of a Policy requirement, the Court does not find that plaintiff had a burden to submit updated results of the same tests where his providers saw that he was not improving. *Cf. Satterwhite v. Metro. Life. Ins. Co.*, 803 F. Supp. 2d 803, 813 (E.D. Tenn. 2011) ("There is no burden on Satterwhite to proactively prove her disability on a continuing basis. . . . In essence, Defendants were requiring that Plaintiff substantiate her disability by means not outlined or requested in any documentation until her benefits had already been denied."); *MacNally v. Life Ins. Co. of N. Am.*, No. 07-CV-4432 PJS/JJG, 2009 WL 1458275, at *24 (D. Minn. May 26, 2009) ("An insurance policy certainly *could* require that a disability claim be supported by 'documentation of significant measured physical limitations,' but MacNally's life-insurance policy does not do so.").

Instead, plaintiff's only burden was to comply with the terms of the Policy by providing the updates requested by LINA, and remaining under the "appropriate care" of his physician, which plaintiff did by following the "plan . . . of ongoing treatment" for his "medically supported diagnos[e]s." (LINA 01233, 01243.) In fact, Dr. Mendez testified that there was nothing inappropriate about the care provided to plaintiff (Ex. F. to Horbatiuk Decl. at 55), and defendant has not argued that plaintiff failed to comply with the "appropriate care" provision of the Policy. "When the language of an ERISA plan is unambiguous, we will not read additional terms into the contract." *Connors*, 272 F.3d at 137 (citation omitted). Another court in this district found that a policy provision requiring "objective medical findings" without specifying the weight or extent of the required findings did not justify the insurer's attempt to minimize and discredit the objective findings in the record. *See Lijoi v. Continental Cas. Co.*, 414 F. Supp. 2d 228, 245 (E.D.N.Y. 2006). In comparison, Dr. Mendez lacks even the "objective findings" policy language in which to anchor his criticism of the various objective tests supporting plaintiff's disability.

Dr. Mendez's emphasis on particular tests performed within a particular timeframe is especially misplaced because he discounted the updated November 2011 FCE for not including "validity testing." Even if such testing—which is not mentioned in the Policy or defined in Dr. Mendez's report—would have made the FCE more reliable, the Court nonetheless concludes that the FCE is probative because its precise measurements are not contradicted by any other evidence in the record. In fact, the FCE is corroborated by the results of similar tests performed by Dr. Myones and Rathod in 2010, and is consistent with the treating providers' observations that plaintiff's condition either remained the same or deteriorated.

Furthermore, in other cases, LINA has ordered its own FCE, *see, e.g.*, *Alfano*, 2009 WL 222351 at *7-8, and it chose not to do so here. *Cf. Chan v. Hartford Life Ins. Co.*, No. 02 Civ. 2943(LMM), 2004 WL 2002988, at *9 (S.D.N.Y. Sept. 8, 2004) (finding that denial of benefits was "call[ed] into question" by insurer's decision not to order an FCE). In light of LINA's decision, the Court need not discount the available FCE simply because one reviewer believed

it could have been more convincing with additional testing. Other courts have reversed benefits denials where the insurer dismissed probative clinical evidence simply for lack of validity testing. *See, e.g.*, *Satterwhite*, 803 F. Supp. 2d at 813; *Wilson v. John C. Lincoln Health Network Grp. Disability Income Plan*, No. CV-04-1373-PHX-NVW, 2006 WL 798703, at *9 (D. Ariz. Mar. 28, 2006); *Petroff v. Verizon North, Inc.*, No. CIV.A. 02-318 ERIE, 2004 WL 1047896, at *16 (W.D. Pa. May 4, 2004). Likewise, the Second Circuit has found the denial of benefits to be arbitrary and capricious where an ERISA plan relied on an "*ipse dixit* pronouncement" in support of its own experts which conflicted with the available medical evidence. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1072-73 (2d Cir. 1995). Dr. Mendez's summary dismissal of the FCE without considering its consistency with the overall record was a similarly arbitrary pronouncement.

Dr. Mendez's failure to address the FCE in light of the overall record is related to his belief that plaintiff's records before June 1, 2011 were not relevant to whether an impairment continued after that date.[8] (Ex.

F to Horbatiuk Decl. at 80.) However, the Court concludes that Dr. Mendez's minimization of the earlier records further undermines his testimony. In order to determine whether a claimant's disability is ongoing, one would have to consider whether there was any change in the claimant's condition, which one cannot perceive without examining the earlier records. Likewise, if it appears based on the earlier records and a more recent in-person examination that a claimant's condition has not changed at all, as is the case here, the necessity of requiring updated tests is called into question. Dr. Mendez did not reach that question, because his review did not address the lack of a change in plaintiff's condition. Therefore, the Court concludes that his opinion is simply less comprehensive and deserving of less weight than those of the treating providers, particularly Drs. Jakobsen and Ginzburg, who observed plaintiff over time.

In addition to the FCE, Dr. Mendez also failed to consider other available medical evidence: namely, the MRIs and other testing he faulted for being "diagnostic," apart from being beyond his one-month window. However, even if these tests were diagnostic, LINA cited them as examples of the necessary information doctors should provide in support of a benefits claim. (*See, e.g.*, LINA 00206 (instructing doctors to submit "[t]est results/findings (for example MRI's, EKG's, x-ray's, etc)").) Therefore, the Court concludes that the objective tests, combined with numerous observations by treating providers that plaintiff's condition did not improve after the tests, are far more probative of plaintiff's disability than Dr. Mendez's file review.

---

[8] In the same vein, Dr. Mendez also discounted the FCE for an alternative reason: "even if valid this study would not be a time-concurrent measurement of functional deficits back to [plaintiff's] paid-through date, 6/1/11, over 5 months earlier." (LINA 00451.) That critique is flatly inconsistent with defendant's letter to plaintiff stating that his appeal should include additional information, including test results, for the period beyond June 1, 2011. (LINA 00645.) Therefore, the Court finds that the Golub FCE was timely. Furthermore, Dr. Mendez's timeliness objection misses the point that if plaintiff's FCE measurements were similar in November 2011 to what they were in June 2010, there would be no basis for concluding that plaintiff's disability had ever gone away. In other words, there would be no grounds for the termination of plaintiff's benefits during that time period. Dr. Mendez's failure to address this basic point about the continuities in

plaintiff's record undermines his opinion in the Court's view.

This Court's evaluation of Dr. Mendez's report aligns with the decisions of other courts, both within and outside of this Circuit, which have overturned benefits denials where Dr. Mendez imposed an extra-policy requirement or failed to address clinical evidence in the record. *See Deloach v. Great Atl. & Pac. Tea Co. LTD Plan*, No. 09–14087, 2013 WL 363840, at *5 (E.D. Mich. Jan. 30, 2013) (noting, in case involving Dr. Mendez, the lack of a plan requirement for objective test results and the difficulty of measuring certain conditions such as chronic fatigue by objective tests); *Wykstra v. Life Ins. Co. of N. Am.*, 849 F. Supp. 2d 285, 295 (N.D.N.Y. 2012) (finding benefits denial arbitrary and capricious where defendant's experts, including Dr. Mendez, misapplied the information provided by plaintiff's treating providers); *Jones*, 829 F. Supp. 2d at 170 (granting summary judgment and disability benefits to plaintiff where Dr. Mendez "ignored Dr. Maxwell's opinion that Plaintiff was unable to work and Dr. Venci's physical capacity assessments"); *Fourney v. Life Ins. Co. of N. Am.*, No. 2:09-0176, 2010 WL 4722035, at *14 (S.D. W.Va. Nov. 15, 2010) (finding that "Dr. Mendez ignored the severity of Fourney's medical condition" and that "LINA can offer no reason why Dr. Mendez's opinion, which resulted from a mere administrative review, should be valued over the unanimous conclusions of Fourney's own physicians"); *Alfano*, 2009 WL 222351, at *22 (considering Dr. Mendez's opinion "unreliable" because it was "inconsistent with the actual data contained in the FCE"); *MacNally*, 2009 WL 1458275, at *24 ("In particular, LINA had no business denying MacNally's . . . claim on the basis of Mendez's opinion"); *Archer v. United Techs. Corp.*, No. 3:07-cv-1485-M, 2009 WL 561375, at *6-7 (N.D. Tex. Mar. 3, 2009) (finding benefits denial to be an abuse of discretion where Dr.

Mendez's "'no documentation' conclusion was made in spite of the MSLT results and Dr. Greenfield's conclusion and diagnosis").

2. Dr. Fossier

With respect to Dr. Fossier, the Court affords little weight to his "rationale" because, although Dr. Fossier suggests that plaintiff's claim is not adequately supported by a current FCE (the Golub FCE did not occur until the month after Dr. Fossier's report), that absence of evidence did not stop Dr. Fossier from reaching an affirmative conclusion that he "would think" plaintiff could perform light work. In the single page following that conclusion, however, Dr. Fossier provides no explanation, analysis, or references to any evidence, nor does he address any of the specific and contrary conclusions in plaintiff's medical records, including the 2010 findings by Dr. Myones and Rathod that plaintiff could not perform light work, and plaintiff's lack of improvement since then. Thus, the Court concludes that Dr. Fossier's brief, unexplained conclusion is far less probative than the more extensive and clinically-supported conclusions of the treating providers. *Cf. Alfano*, 2009 WL 222351 at *18 (reversing benefits denial where LINA did not "provide any explanation-let alone a persuasive one-as to why Alfano should be deemed capable of performing his sedentary occupation when [functional tests] indicate[d] that Alfano cannot sit for more than 2.5 hours per day"). Dr. Fossier does state that he unsuccessfully attempted to call Dr. Jakobsen, but he does not address, much less explain, why his affirmative conclusion about plaintiff's functionality is so different from Dr. Jakobsen's, who examined plaintiff more than ten times in person. *Cf. Rappa*, 2007 WL 4373949, at *11 (finding benefits denial arbitrary and capricious where non-examining reviewer's report consisted only

of answers to five questions provided by LINA and provided no reason why the reviewer disagreed with the conclusions of the treating providers); *Lijoi*, 414 F. Supp. 2d at 245 (finding plaintiff entitled to benefits where "Continental provides no explanation for why the findings of its own medical and vocational specialists who saw Lijoi only once constituted reliable medical evidence, while the reports of Lijoi's specialists, who saw him on a much more extensive and regular basis, were unreliable. . . . The Court does not discredit the findings of multiple physicians as easily as Continental did, particularly when the opposing medical opinion is based on the single evaluation of a doctor hired by an insurance company").

Finally, as discussed above, neither Dr. Fossier nor Dr. Mendez is specially qualified to address plaintiff's ulcerative colitis. Dr. Fossier did not address it at all, and Dr. Mendez was dismissive of it because the condition "dates back to the 1980s." (LINA 00451.) Nonetheless, plaintiff's longtime treating physician Dr. Ginzburg concluded in both April and July 2011 that the condition had deteriorated and prevented plaintiff's return to work, and that the stress of work would make the condition even worse. (*Id.* 00054, 00708.) Notably, it appears that Dr. Mendez did not review Dr. Ginzburg's most recent evaluations: his report incorrectly states that the most recent record from Dr. Ginzburg was dated February 12, 2010 (*id.* 00450), and, in his deposition, Dr. Mendez testified that he did not recall seeing the July 27, 2011 letter in which Dr. Ginzburg confirmed his diagnosis. (Ex. F to Horbatiuk Decl. at 168.) Their lack of expertise concerning plaintiff's ulcerative colitis, and the absence of specific findings in their reports about its effects on plaintiff in the workplace, further undermine the conclusions of Drs. Mendez and Fossier in comparison with the conclusions of the treating providers.

E. Social Security Determination

As noted *supra*, the SSA determined that plaintiff was disabled in December 2010, the same month that LINA determined that plaintiff's records no longer supported his disability. Even though the SSA's determination is not binding on LINA or this Court, and the Court would reach the same conclusion in this case in the absence of the SSA determination, it is nonetheless probative of plaintiff's disability under the Policy. *Paese*, 448 F.3d at 442 ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's definition of disability may differ from that in the Sequa Plan."). The Court concludes that the SSA's determination corroborates all of the other medical evidence previously discussed and supports plaintiff's showing that he is disabled under the Policy.[9]

* * *

Having taken into account all of the "different . . . case-specific, factors" and weighed them all together, *Metro. Life. Ins. Co.*, 554 U.S. at 117, the Court concludes that plaintiff met his burden to show that he

_____

[9] Because the Policy requires claimants to exhaust Social Security benefits before receiving payment under the Policy, defendant has counter-claimed for $8,831.25 in benefits paid to plaintiff in 2010, which plaintiff later received in a Social Security back payment. Plaintiff does not dispute this amount, but argues that it is outweighed by the benefits owed to plaintiff. The Court therefore grants summary judgment to defendant on the counter-claim, but orders that defendant shall deduct the $8,831.25 from the amount of disability benefits owed to plaintiff.

is disabled under the Policy's "Regular Occupation" definition of disability. Plaintiff also seeks a declaratory judgment that he is disabled under the "any occupation" standard, which goes into effect after 24 months of disability payments. Accordingly, the Court must next consider whether to grant plaintiff's request or remand his claim to LINA for consideration under the "any occupation" standard.

## VI. REMEDY

Defendant argues that, even if plaintiff meets the "Regular Occupation" definition, he is at most entitled to the remainder of the benefits "payable for 24 months." (LINA 01225.) After the first 24 months of benefits, the definition of disability under the Policy changes, and defendant seeks the opportunity to evaluate plaintiff's claim under that definition, which it had not done previously because it terminated plaintiff's benefits before the 24-month mark.

The Policy's definition of disability after the 24-month mark is as follows:

> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is . . . unable to perform the material duties of *any occupation* for which he or she is, or may reasonably become, qualified based on education, training or experience.

(*Id.* (emphasis added).) Defendant argues that the "any occupation" standard is fundamentally different from the "Regular Occupation" standard, and that the Court should not decide whether plaintiff meets the "any occupation" standard without first requiring administrative exhaustion.

In support of that argument, defendant relies on two Second Circuit cases which held that, where the policies featured a split definition of disability similar to the one in this case, and the insurer had not yet determined the claimant's eligibility for benefits beyond the 24-month mark, the district courts lacked jurisdiction until the insurers first made the "any occupation" determination. In particular, the more recent of these cases involved a definition of disability which is strikingly similar to the definition in the Policy here. *See Peterson v. Continental Cas. Co.*, 282 F.3d 112, 114-15 (2d Cir. 2002); *see also Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 140-41 (2d Cir. 2000). Accordingly, defendant suggests that the Court is without jurisdiction to award plaintiff any benefits beyond the 24-month period, and that it should not do so in any event, because his eligibility for such benefits is unexhausted.

Taking the former point first, defendant's jurisdictional argument is misplaced: the Second Circuit has since held that the failure to exhaust under ERISA is an affirmative defense, and does not deprive a district court of jurisdiction. *See Paese*, 449 F.3d at 445 ("The fact that ERISA . . . does not even contain a statutory exhaustion requirement, further strengthens our conclusion. Indeed, the requirement is purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make ERISA administrative exhaustion a jurisdictional requirement.").

Even if the Court is not deprived of jurisdiction by the lack of exhaustion, however, the Court must determine whether a remand for the purpose of exhaustion is appropriate in this case. Although "ERISA itself does not contain an exhaustion requirement," *Kirkendall v. Halliburton,*

*Inc.*, 707 F.3d 173, 179 (2d Cir. 2013), the Second Circuit has long recognized "the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases," *Alfarone v. Bernie Wolff Const. Corp.*, 788 F.2d 76, 79 (2d Cir. 1986).

Remand is often the appropriate remedy for unexhausted claims, but in exercising its discretion, the Court must consider whether plaintiff has made a "clear and positive showing that seeking review by the carrier would be futile." *Paese*, 339 F.3d at 443 (quoting *Jones*, 223 F.3d at 140). The Court concludes that plaintiff has not made that showing here, because LINA never had the opportunity to evaluate plaintiff's claim under the "any occupation" standard, since the "Regular Occupation" period never expired. As a result, there is no evidence in this record about plaintiff's condition after the expiration of the "Regular Occupation" period or his condition during the "any occupation" period, which would have occurred during the pendency of this litigation. Therefore, under the particular circumstances of this case, the Court cannot conclude that plaintiff has clearly and positively shown that it would be futile for LINA to have the opportunity to apply a different standard involving a different time period.

Plaintiff's argument against remand relies on the Second Circuit's decision in *Paese*, where the district court granted long-term benefits to a plaintiff under the "any occupation" standard even though the insurer had not explicitly considered it below. *See* 449 F.3d at 443. However, that case—which was resolved on estoppel and waiver grounds, not the futility of remand—is not directly analogous because the transition from the own-occupation to "any occupation" standard occurred during the

pendency of Paese's administrative appeal and prior to the insurer's final determination of his claim. *Id.* at 447. Thus, the insurer effectively passed on its opportunity to consider the claim under a separate standard, unlike here, where LINA never had that opportunity before the beginning of this lawsuit. This situation is much more closely analogous to *Peterson*, where the insurer likewise denied benefits, and the plaintiff filed suit, before the expiration of the 24-month regular-occupation period. *See* 282 F.3d at 114-18.[10]

Plaintiff's case is also distinct from *Lijoi*, where another court in this district awarded benefits through the date of judgment despite the fact that the insurer

_____

[10] Because *Paese* was decided on estoppel and waiver grounds, it does not appear that the Second Circuit has addressed these circumstances since *Peterson*. Although, as noted, the Second Circuit no longer considers ERISA exhaustion to be a jurisdictional requirement, as it did in *Peterson*, it has not indicated that the result in *Peterson* would be any different today. Thus, under very similar circumstances, this Court, in its discretion, reaches the same conclusion as the Second Circuit in *Peterson*. In doing so, the Court notes that other circuits are divided on this question. The Seventh Circuit reversed a district court's award of benefits under the "any occupation" standard when, like here, the insurer had not yet applied that standard. *See Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 607 (7th Cir. 2008). However, the Fourth and Eleventh Circuits have reached the opposite result. *See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 876 (4th Cir. 2011); *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1201 (11th Cir. 2007). The Court observes that both the Fourth and Eleventh Circuit cases relied on a Sixth Circuit case where the insurer had the opportunity to decide the plaintiff's claim under the alternative standard and passed on it, unlike LINA here, where the 24-month "Regular Occupation" period never expired. *See Dozier v. Sun Life Assur. Co. of Can.*, 466 F.3d 532, 533-535 (6th Cir. 2006). Moreover, in *DuPerry*, there was evidence that the plaintiff could "never" return to work. 632 F.3d at 864. Here, no similar evidence indicates that plaintiff's condition is permanent and irreversible.

had not decided the plaintiff's claim under the "any occupation" standard. There, the plaintiff submitted evidence of an administrative law judge's determination *after* the transition from "Regular Occupation" to "any occupation," which was supplemented by even later records showing that the plaintiff's condition continued to deteriorate. *See* 414 F. Supp. 2d at 248. Here, the record does not contain any evidence from the "any occupation" period, which was never reached before this lawsuit began. Therefore, although plaintiff is entitled to benefits for the 24-month "Regular Occupation" period, the Court exercises its discretion to remand plaintiff's claim for benefits after 24 months for consideration under the "any occupation" standard.

## VII. CONCLUSION

Having considered the entire record, the Court concludes that plaintiff has met his burden to show that he is disabled under the Policy's "Regular Occupation" standard. The Court's conclusion is based primarily on the unified opinions of plaintiff's treating providers and the objective findings, including the FCE showing that plaintiff cannot stand continuously for more than 9 minutes, or sit for more than 7 minutes, due to multiple degenerative changes in his spine, among other disorders. Separately, the conclusion of Dr. Ginzburg that plaintiff cannot return to work due to his ulcerative colitis, which could become worse with the stress of work, is essentially unrebutted. The Court is not persuaded by defendant's arguments concerning "time concurrent" evidence, because the Policy contains no requirement that records be "time concurrent," nor does it require that particular tests be performed.

However, the Court concludes that remand is necessary in order for LINA to evaluate plaintiff's claim under the "any occupation" standard, because LINA never had the opportunity to apply that standard, since the "Regular Occupation" period never expired. As a result, there is no medical evidence in the record concerning the "any occupation" period. Accordingly, although plaintiff's motion for summary judgment is granted with respect to the 24 months of long-term disability benefits under the "Regulation Occupation" standard, his claim for additional benefits under the "any occupation" standard is remanded. The Court also grants in part defendant's motion for summary judgment, on the counter-claim only, which plaintiff has not opposed. Defendant shall deduct $8,831.25 from the amount owed to plaintiff. The remainder of defendant's motion is denied.

Plaintiff shall submit any request for attorney's fees within two weeks of the date of this order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 7, 2014
    Central Islip, NY

*  *  *

Plaintiff is represented by Jeffrey D. Delott, 366 North Broadway, Suite 410k-3, Jericho, NY 11753. Defendant is represented by Kevin G. Horbatiuk and Marcin J. Kurzatkowski, Russo, Keane & Toner, LLP, 33 Whitehall Street, 16th Floor, New York, NY 10004.